SIXTH DIVISION

February 2, 2001

No. 1-98-4854

THE PEOPLE OF THE STATE OF ILLINOIS,    ) Appeal from the 

 ) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 97 CR 30404

)

MARINA MORENO, ) Honorable

) Lawrence P. Fox,

Defendant-Appellant. ) Judge Presiding. 

JUSTICE O'BRIEN delivered the opinion of the court:

Defendant Marina Moreno appeals the denial of her motion to bar  prosecution and dismiss the criminal charges against her.  145 Ill. 2d R. 604(f).  On appeal, defendant contends the State is collaterally estopped from criminally prosecuting her for aggravated battery of a child because every contested factual issue to be tried in the criminal case was resolved in her favor in a prior juvenile court proceeding.  We affirm.

Defendant is the mother of four minors named in separate juvenile wardship petitions.  The petition alleged that the minors, ranging in age from two to eight years, were subject to a substantial risk of physical injury and thus, abused, solely because of an injury sustained by their seven-month-old cousin, G.M., while in defendant's care.  While the juvenile petitions were pending, the State filed criminal charges against defendant, alleging that she committed aggravated battery of a child upon G.M.

At the juvenile adjudicatory hearing, defendant testified that she was G.M.'s maternal aunt, and that since he was six weeks old, she had been caring for him daily while her sister worked.  On the morning of September 10, 1997, she fed G.M. while he was seated, but unbuckled, in his car seat on the kitchen table.  She then started dressing her two-year-old so they could pick up her four-year-old from his prekindergarten class.  While defendant was tying the two-year-old's shoes, she saw G.M.'s feet dangling from the car seat and tried to get to him.  Before she could do so, G.M. toppled head-first out of the seat and onto the floor three feet below.  When she picked him up, she saw a circular red spot on his forehead.

Defendant took G.M. into the bedroom.  She noticed that his eyes rolled upwards, his extremities stiffened, and he made some vocal noises.  Defendant also noticed that his lips lost color, but she was able to reverse that by applying light pressure on his heart.  

Defendant called her sister and then dialed 911.  When defendant went outside to meet the paramedics, G.M. vomited twice.  Defendant then accompanied G.M. to the hospital, where she informed medical personnel of the occurrence and stayed with the baby's parents until G.M. was released.

About 11 p.m. defendant's sister called from another hospital, Children's Memorial Hospital, informing her that G.M. had a fractured skull, cerebral edema, and a subdural hematoma.  Defendant joined her sister at the hospital, but was never interviewed by social workers there regarding how the injury occurred.

G.M.'s mother testified that G.M. was fine when she dropped him off at defendant's home on the day in question.  Two months after the incident, she had no reason to believe that defendant had abused him.

The State's expert witness testified that she was a pediatric radiologist and a member of the protective services team at Children's Memorial Hospital (CMH).  The juvenile court qualified her as an expert in child abuse and shaken baby syndrome.  The State’s expert testified that a social worker came to her with this case and that she read the CT scan done on G.M.  She observed an interhemispheric subdural hematoma and a subdural hematoma on the right side and right hemisphere which, she testified, are symptoms of shaken baby syndrome.  She claimed that she had not seen interhemispheric subdural hematomas from even high falls, but had seen it in an automobile accident case where the baby received a whiplash injury as a result of the car rolling at very high speed.

The State’s expert further testified that she reviewed the four skull X rays taken of G.M. and found no evidence of fractures to his skull as had been initially reported by the resident physician and that G.M.'s bone scan was normal, but he had bilateral retinal hemorrhages.  She told the team social worker that the findings on the CT scan were not consistent with the history given and that in her opinion the injuries sustained were not accidental and could not have been caused by the fall described.

During cross-examination, the State’s expert acknowledged that she had not examined G.M.  She also testified that she had not spoken to defendant, but did speak to G.M.'s mother in the MRI unit.  She acknowledged that she had not seen evidence of the bilateral retinal hemorrhages reported by an ophthalmologist whose level of training was unknown to her.  She relied on the chart as confirmation of the "attending."  She also acknowledged that she did not see any associated skeletal injuries and agreed that retinal hemorrhages can occur from accidental or noninflicted causes.  She indicated that the ophthalmologist noted that G.M. had an occipital skull fracture, which he had taken from the chart, and that there was retinal hemorrhaging.  She testified that the ophthalmologist knew nothing about occipital injuries and was wrong in reporting it.  Nevertheless, the State’s expert opined that the force necessary to cause the right interhemispheric subdural hematoma sustained by G.M. could not have been generated by the weight of the infant falling down on the floor even if he was in a car seat.

The State rested its case in chief after publishing sections of the medical reports that had been received into evidence.  Defendant's motion for a directed finding was denied by the court and her counsel published additional excerpts from the medical reports. 

The court then interviewed defendant's eight-year-old son in chambers and  gave a synopsis of their conversation for the record.  The boy told the juvenile court that his mother never hurt him or his siblings and that he wanted to know why he could not live with his parents.

On the following court date, the juvenile court heard testimony from a child welfare specialist who had been assigned by the court and the Department of Children and Family Services to provide an evaluation of defendant's family.  She concluded the family was loving, found no evidence of abuse to any of the minors, believed they had never been abused by their parents, and believed they were not at any risk of abuse or neglect.  Additionally, two teachers at the school attended by defendant's three oldest children testified that they had never observed any evidence of abuse or neglect by defendant and that they found the children to be well-adjusted children of a good mother, who were not at risk of injury in their home environment.

Dr. David Frim testified that he was a pediatric neurosurgeon and assistant professor of surgery and neurosurgery in the biological sciences division of the University of Chicago.  He reviewed G.M.'s medical records from CMH and ascertained from the report of the ophthalmological examination done by Dr. Eagle that he was a doctor-in-training as opposed to an attending physician.  That report noted bilateral retinal hemorrhaging and occipital skull fracture.

Dr. Frim examined G.M. on October 21, 1997, and found no evidence of a fracture or retinal hemorrhaging.  He noted that the report prepared by the attending ophthalmologist at CMH a few days after the incident indicated that the child had scattered retinal hemorrhages only on one side.  Dr. Frim found this significant since the diagnosis of shaken baby syndrome had been based in large measure on bilateral retinal hemorrhages and occipital skull fracture which were not borne out in these observations.  Dr. Frim stated that interhemispheric subdural hematoma may result from a blow to the head, nonaccidental trauma, or when a baby is shaken; however, he did not believe that the presence of such a hematoma could alone support a finding of shaken baby syndrome since he has seen that occur in many accidental injury cases. 

Dr. Frim also testified that his reading of the CT scan and MRI led him to believe that G.M. had a frontal subdural hematoma under the area on the bruised forehead which extended around the corner of the space in between the two hemispheres.  In his opinion, the injuries observed in these scans were consistent with a fall, "a single blow to the head onto a hard surface."  

During cross-examination, he testified that he could not rule out any mechanism of injury regarding a solitary blow to the head; but on redirect examination, Dr. Frim stated that there was nothing in the record to lead him to believe that this injury was not accidental.

At the close of evidence and argument, the juvenile court found that the State failed to show by a preponderance of the evidence that the injuries sustained by G.M. in defendant's care were other than accidental, stating, "[I]t's clear to me based on all the evidence and all the evidence, including the way the mother testified as well as the way [defendant] testified, that the injuries were nothing but accidental."  The court also found that the evidence failed to establish that defendant's four children were abused due to substantial risk of physical injury in the home and accordingly dismissed the State's petitions.

The State appealed, and defendant filed a motion to collaterally estop her criminal prosecution based on the juvenile court's findings at the adjudicatory hearing.  Because the State's appeal was pending, the trial court denied defendant's motion as untimely.  We then affirmed on appeal from the juvenile court proceeding, concluding that the juvenile court's decision that the State had not met its burden of proving that G.M.'s injury was other than accidental was not against the manifest weight of the evidence.  
In re P.M.,
 No. 1-98-0483 (1998) (unpublished order under Supreme Court Rule 23).

Defendant thereafter filed a new motion to bar prosecution and dismiss the criminal information with prejudice on the grounds of collateral estoppel and double jeopardy.  After a hearing, the trial court denied the motion, determining that the prior adjudication was not based on all the evidence that the State could have presented and would present in a criminal prosecution, and therefore the State had not been provided a full and fair opportunity to present all its evidence.  Citing to 
People v. Percifull
, 9 Cal. App. 4th 1457, 12 Cal. Rptr. 2d 331 (1992), the trial court reasoned that no consideration was as compelling as the public's right to have criminal culpability separately and fully assessed in a trial, even if the result of the trial may ultimately be inconsistent with the conclusion of the juvenile court following the adjudicatory hearing.

In this appeal, defendant contends that the State is collaterally estopped from prosecuting her because every contested factual issue in the case was explicitly resolved in her favor at the juvenile court proceeding.  She argues that traditional principles of collateral estoppel apply to her case and that no other policy considerations prevent the doctrine's application.  

Collateral estoppel bars a party from relitigating an issue decided in a prior proceeding.  The doctrine is applicable when the issue decided in the prior proceeding is identical with the one presented in the suit in question, there was a final judgment on the merits in the prior proceeding, and the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.  
People v. Pawlaczyk
, 189 Ill. 2d 177, 189 (2000).  Additionally, the party against whom estoppel is asserted must previously have had a full and fair opportunity to litigate the issue and must suffer no unfairness as a result of the doctrine's application.  
Pawlaczyk
, 189 Ill. 2d at 189.  Application of collateral estoppel must be determined on a case-by-case basis and only when equity requires.  
Talarico v. Dunlap
, 177 Ill. 2d 185, 200 (1997).

Although defendant cites no Illinois case holding that dismissal of a petition for adjudication of wardship collaterally estops subsequent criminal proceedings, defendant analogizes to another Illinois case which held that the dismissal of a civil action barred subsequent criminal proceedings.  See 
People v. Buonavolanto
, 238 Ill. App. 3d 665 (1992) (ruling for defendant in civil forfeiture action estopped State from bringing criminal action based upon same issue of whether defendant's car was used to facilitate unlawful delivery of controlled substance).  Defendant also cites to 
Bowling v. State
, 298 Md. 396, 470 A.2d 797 (1984), where Maryland's high court held that the State was collaterally estopped from prosecuting the defendant on charges of sexual assault of his daughter.  There, the trial court had dismissed a prior civil proceeding on a petition to determine whether the daughter was a child in need of assistance on the ground that the State had failed to prove by a preponderance of the evidence that the defendant had committed the alleged acts.  
Bowling
, 298 Md. at 398, 470 A.2d at 798.

The State acknowledges that no Illinois court has addressed the question of whether a factual finding in a juvenile abuse and neglect proceeding collaterally estops a subsequent criminal proceeding.  However, the State cites to five cases from other jurisdictions where the courts concluded that collateral estoppel does not preclude criminal prosecution in this type of situation.  See 
People v. Percifull
, 9 Cal. App. 4th 1457, 12 Cal. Rptr. 2d 331 (1992); 
State v. Cleveland
, 58 Wash. App. 634, 794 P.2d 546 (1990); 
People v. Gates
, 434 Mich. 146, 452 N.W.2d 627 ( 1990); 
Gregory v. Commonwealth
, 610 S.W.2d 598 (Ky. 1980); 
State v. Felter
, No. H-99-001 (Ohio  App.  September 17, 1999).  
Percifull
 and 
Cleveland
 are persuasive. 

In 
Percifull
, the California appellate court accepted that the threshold requirements of collateral estoppel had been established where a juvenile court concluded that the State had not proved allegations in a dependency petition that the parents had injured their child or allowed him to be injured, and the parents then moved to dismiss felony child abuse and endangerment charges against them arising out of the same facts.  
Percifull
, 9 Cal. App. 4th at 1459, 12 Cal. Rptr. 2d at 331-32.  Nonetheless, the court determined that policy considerations required that prosecution be allowed.  The court noted in particular the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence, and the ability of a trial, as opposed to a dependency proceeding, to vindicate society's insistence that every citizen obey the penal laws.  
Percifull
, 9 Cal. App. 4th at 1460, 12 Cal. Rptr. 2d at 333-34.

In 
Cleveland
, the Washington appellate court addressed the trial court’s finding that the State had not shown by a preponderance of the evidence that sexual abuse alleged in a petition for dependency had occurred, and defendant thereafter moved for dismissal of criminal charges of statutory rape and indecent liberties, asserting that the criminal charges were based on allegations of sexual abuse arising from the same facts.  
Cleveland
, 58 Wash. App. at 636, 794 P.2d at 547.  The appellate court found that collateral estoppel could not be applied because of  public policy.  
Cleveland
, 58 Wash. App. at 643, 794 P.2d at 551.  The court explained that because dependency proceedings are often attended with a sense of urgency, are held as promptly as reasonably possible, and are narrowly focused on the welfare of the child, the State neither needs nor performs the extensive preparation typically required for felony trials.  
Cleveland
, 58 Wash. App. at 643, 794 P.2d at 551.  The appellate court also considered that more resources are used in developing a felony prosecution than in a dependency hearing, dependency is not decided by a jury, and if faced with the application of collateral estoppel, the State may become reluctant to conduct dependency proceedings in cases where one or more of the same issues would arise in subsequent criminal prosecutions.  
Cleveland
, 58 Wash. App. at 644, 794 P.2d at 551.

 More importantly, in 
People v. Wouk
, 317 Ill. App. 3d 33, 739 N.E.2d 64 (2000), another division of this court addressed whether order of protection proceedings collaterally estopped the State in a subsequent criminal proceeding.  The court concluded they did not.

In 
Wouk
, the court noted that
  "'collateral estoppel must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped.'"   
Wouk,
 317 Ill. App. 3d at 39, 739 N. E. 2d at 69, quoting
 Talarico
, 177 Ill. 2d at  191-92.   The 
Wouk
 court also quoted 
section 28 of the Restatement (Second) of Judgments:  

"'Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances: 

 * * * 

(5) There is a clear and convincing need for a new determination of the issue (a) 
 because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action ***.'"   Wouk, 317 Ill. App. 3d at 40, 739 N. E. 2d at 69-70, quoting Restatement (Second) of Judgments §28(5) (1982).

The 
Wouk
 court concluded that important public policy reasons existed to prevent the application of collateral estoppel.    Specifically, the court noted that an order of protection is an expedited proceeding, the focus of which is on the immediate protection of the abused family or household members, not the guilt of the accused and the more general protection of society.   
Wouk
, 317 Ill. App. 3d at 40-41, 739 N. E. 2d at 70.  The court also determined that it was unclear whether unfairness to the State would result from the application of the collateral estoppel doctrine; therefore, the court declined to give preclusive effect to the finding made during the order of protection hearing.   
Wouk
, 317 Ill. App. 3d at 40-41, 739 N. E. 2d at 70.

In the present case, important public policy reasons exist to prevent the application of collateral estoppel and its application would be inappropriate.  In the juvenile proceeding, the ultimate litigated issue was whether the minor children of defendant were abused due to defendant’s involvement with the injuries of G.M.; in the subsequent criminal proceeding, the ultimate litigated issue will be whether the defendant is criminally culpable for the injuries to G.M.  In the juvenile proceeding, the State’s purpose is protection of defendant’s minor children; in the criminal proceeding, the State’s purpose is discovering if defendant injured G.M. and punishing her if found guilty.  The differences of purpose and goal in the civil and criminal procedures are  "very real."   
People v. Moore
, 138 Ill. 2d 162, 169 (1990).  A criminal trial is the exclusive forum for determining guilt or innocence, and of the public's right to have criminal culpability assessed at a trial.  See 
Percifull
, 9 Cal. App. 4th at 1462, 12 Cal. Rptr. 2d at 333-34.  

Also, in the juvenile proceeding the State did not have a full and fair opportunity to litigate the issue of whether defendant was criminally culpable of aggravated battery of a child.  When two proceedings serve different public interests and purposes, those differing concerns may bear upon the State's actions in each proceeding.   Here, the State informed the trial court that it intended to call at least seven witnesses at trial whose testimony it had not presented at the juvenile hearing.  Thus, we do not believe that application of collateral estoppel would be appropriate in this case.

Accordingly, we affirm the order of the circuit court.

Affirmed.

CAMPBELL, P.J., and BUCKLEY, J., concur.